12-1-442 U.S. v. Luis Neves Canales and 12-2412 U.S. v. Rafael Galán Olivaria. Good morning. May it please the Court, David Shaughnessy v. Rafael Galán Olivaria, on behalf of the I'd like to talk about the search in this case. It's an unusual search warrant in that there was no corroborating background material included whatsoever in the warrant affidavit. The entire affidavit was a series of eyewitness observations by the affiant. That provided the only link to the apartment that was searched and provided the only basis for probable cause. The problem for the government is that the affiant repeatedly misstated and misled the issuing magistrate that he had actually seen my client and other people engaged in illicit activities entering and exiting the apartment in question. In fact, he never did see that. And that was established unequivocally. He admitted it. You don't make any difference considering a good faith exception? Well, I don't see how... Your Honor, that's an interesting question because if the affiant intentionally included false material in the affidavit, it's hard to see how the search can be justified as good faith. Because good faith is to excuse law enforcement officers who accidentally do things wrong. Well, the good faith issue comes from the person executing the warrant, doesn't it? Well, that's true, Your Honor. However, in this particular case, and the Supreme Court has made clear that the affiant can't simply hand off the warrant to somebody else, which is exactly what happened in this case, as a matter of fact. The affiant swore out the warrant, got the warrant, came with the search team, gave it to someone else, and then he stood outside and pointed out, we'll go in there, and he stayed outside while the warrant was executed. The Supreme Court has said very clearly that that is not sufficient. The question is whether the law enforcement itself, the team, the law enforcement agents, they had acted in an improper manner. And if so, the purpose of the exclusionary rule, and this is a perfect example of why it should be applied, is to show law enforcement that when you swear out an affidavit and you say you see something, you have to have seen it. What's your theory on where the people were going that he saw? Well, I don't know, Your Honor. I've never been inside the building. Isn't the evidence that once they disappeared from his sight, the only place to go was either the- Well, that's a retrospective approach to it. You can look at what came out later in the Franks hearing and talk about what the layout of the building was. So I'll deal with that as you ask the question, Your Honor. But, in fact, even on that level, all the magistrate determined was that this particular affiant had been, he had never searched in this housing project before. However, he was familiar with the housing project, and he had been in other buildings. And what he said was, I have seen other buildings, and they're always laid out this kind of same configuration. So he assumed, well, this one must have been laid out the same way. But what they don't go with, even putting that aside, how valid that may be, there's nothing in the background, even after the Franks testimony, as to whether there were any back exits. And if you look at the picture that I included, the photograph from the government, you can see there's a backside, an empty backside to this building. Presumably there are exits somewhere. In addition to that, one of the witnesses at the suppression hearing was Mr. Golan's neighbor from the next building. That building in itself is continuous. There's just not enough evidence, even at the suppression hearing, to say, unequivocally, he must have been going into that apartment. I mean, you can say, well, maybe there's a fair inference that he did that. Well, if you're going to say that, then aren't at most, aren't we looking at his negligence here? He's not being reckless about his statement, is he? Well, certainly it's not knowing or intentional. I disagree, Your Honor. You do? Yes, I do, because the question is reckless or knowledgeable as to what? As to the falsity of what he put in the affidavit. When a police officer says, I saw him go in and out of an apartment seven different times, a police officer knows what that means and knows what that signifies to the search warrant magistrate. It's a different story to say, well, I didn't see him go in, but I think he went in. And then the search warrant magistrate would say, well, why do you think that? What's your basis for that? And the search warrant magistrate may have said, well, I don't think that's enough. You have to go back and do the things that Judge Coyote was just asking about. Well, how do you know what the interior of that building was? Show me. Show me. I'm the magistrate issuing the search warrant. I can't defer to a policeman. And that's exactly what's happened here. According to what happened here, the police officer thinks, well, I know what's going on. I don't have to tell the magistrate. I'll just say, well, these are my conclusions, but I'll counsel them as personal observations. And the reason I suspect that that was done was because there was no background. There was no indication that Mr. Galan lived in that apartment. There were no records. There was no interior observations of the apartment. It was simply – Well, he was seen carrying lactose bags into that apartment, wasn't he? He was seen – the affiant said he saw – and this is an interesting point, because the entire affidavit is a series of narrative observations. In fact, at the very end of the affidavit, the affiant says his sergeant asked him to write down a list of all the things he saw on surveillance. That's what this entire affidavit is, his personal observations. The affiant does say, yes, with his binoculars, he took pains to point out the strength of his binoculars and how he could see that this was a cutting agent for cocaine, right? But the question still is, how did he get – where did he go with that stuff? He says he saw him with a cutting agent. He saw him going into that apartment with those bags. He saw him leaving that apartment, emptying his backpack, what seemed to be crack cocaine and marijuana. A person was seen leaving a motorcycle with a weapon and going into that apartment. Are all those facts? They're false. They're all false. Well, you claim they're false, but somebody swore to having seen them. Your Honor, the affiant who swore to having seen that admitted at the France hearing that he did not see it because he could not see the apartment door. He assumed those things. He assumed each one of those things. He assumed it, and he presented it to the sergeant magistrate as if they were eyewitness observations. And that's critical here. He did not see the apartment door, but I remember. He remembers seeing someone going past. His view was then blocked, and he does not go past the area that is blocked. So is it – I mean, is it far-fetched to think he went into the apartment under those conditions, particularly since he left later with some other matters? Whether it's far-fetched or not I don't think is really the question. I think the question is whether the affiant was truthful in the affidavit, and he wasn't. I mean, it's one thing for him to say, well, I didn't see him going to the apartment or come out of the apartment on any of these seven occasions, but I think he did. I think he did. And then the magistrate would say, well, why do you think that? And it may not have been enough when the affiant explained why he believed that. The search warrant magistrate may not have agreed with it, which is probably why the affiant shorthanded everything and said, well, he went in and out. He came out of the Internet with all these illicit activities. I have to go back to my original question because another officer, by God, I believe his name was. Yes, that's right, Your Honor. It's the one that executed the search warrant. Yes. How would he have known that all this information you claim is false was false from reading the affidavit? Your Honor, I just go back to the Supreme Court. The Supreme Court said that the law enforcement cannot avoid the probable cause, the search warrant requirement of the Constitution by getting a false, swearing out a false affidavit, getting a search warrant, handing it to somebody else and saying, here, you executed a member off the hook. The issue here is, I think, a little bit different. A guy is given a search warrant that has been issued by a judicial officer. Yes. Is he supposed to question that? I'm not saying Pagan himself should have questioned it. Well, he's the one that executed the warrant. Yes. And it is to him that the good faith exception applies. Your Honor, I just think the Supreme Court has said no. I'll read those cases again. Okay. Is my time up already? I'm afraid so. Okay. Thank you. Ms. Parsons? Good morning, Your Honors. Good morning. May it please the Court, I'd like to reserve five minutes of my time. Five minutes? Thank you. Go ahead. I'd like to focus on the issue of judicial bias, actual and the appearance of such in this case, in particular in light of the First Circuit's recent case in August of United States v. Rivera-Rodriguez. As that case has indicated in the Did you file a letter? Yes, I did, Your Honor. And I also joined in Mr. Shaughnessy's letter as well, which was filed on the 18th. As indicated by this circuit, we don't expect judges to be moderators. However, as long as they preserve an attitude of impartiality and guard against giving the jury an impression that the court believes the defendant is guilty. This becomes very problematic when the judge takes on the role of questioning, and the judge has to be particularly mindful. Specifically, in questioning witnesses as in all aspects of trial administration, the court must scrupulously avoid any separate functions in the administration of justice that must not merge. Each judicial intervention raises the possibility that the jury will perceive the court as biased toward one party or another, citing Starr v. United States Supreme Court in 1894, which said that it is obvious that under any system of justice, any system of jury trials, the influence of the trial judge on the jury is necessarily and properly of great weight. And that his lightest word or intimation is received with deference and may prove controlling. Ms. Parsons, can you point us to any indicators in the record? We can read what the judge said, but then we need to put it in context. Absolutely. I detail those at length in my brief, but I'll go through them. I'd like to put that in the context, however. Let me finish my question. Okay. Can you point to any indications that what the judge was doing was having the effect that you're now on appeal pointing towards us? And specifically, usually if a judge is doing something that's really tilting the case in the way that gets our attention, the first person to notice it in the courtroom is defense counsel, and they squawk. They're unhappy with it, and it's manifest in the record. Here, we really don't seem to have much along those lines to work with. It looks like a lot of able defense counsel weren't acting the way that some of the comments might lead you to think they would have acted. Let me just add this, because I had a question along those lines. You might as well answer both. Am I correct that no one objected at the time to the judge's actions? Through a number of these incidents, there were objections. And, in fact, my client's attorney, Mr. Delos, at one point indicated his concern that the judge was having to go in and make those questions and restate issues, and that was made in particular with respect to the notebook and the page number, and I'll try to get to that citation really quickly, where Mr. Delos does that. And if I can't find it, I'll try to find it and give it to you on rebuttal. But the point is that, first of all, in Rivera-Rodriguez, two of the four incidents that were looked at were not preserved. The judges in that case in the circuit indicated that it essentially becomes the same standard either way. But it does on the prejudice issue. But on whether there was error in the first instance, it's not necessarily the same, is it? Well, and I think part of what was going on here, when you read through the entire transcript, which is what has to be done when you're looking at the cumulative effect of these errors, is that you had one person who was objecting to a lot of things that went on, and the others were sort of allowing him to be the team captain. This became an issue, and as I indicated in my brief, it became a source of conflict that made the judge go very harshly against the defense, and in particular Mr. Insani. As far as in the other case that you're relying on, too, we noted that the judge interceded on really what were essential, very crucial points in the case. With respect to your client, what was the most harmful point that testimony elicited by the judge went to? There were a number. In the beginning, it was her, first of all, taking on the role as the prosecutor. She wasn't clear. What testimony was elicited by her that was most harmful? She came in and developed part of the conspiracy through Pizarro by not asking clarifying questions, but actually as a second prosecutor, which she asked about to have him describe, okay, and in the times that you went into CELUS, did you get to see members of the organization that used to work with you? Okay? Essential point. She also asked, what about other people's knowledge about what you were doing while you were at CELUS? These are not judges' questions. These are prosecutors' questions. Very devastating. The notebook, which contained drug records that affected my client, who, by the way, was acquitted of four of the six charges, talks about how to get that in. There's an objection. Repeatedly, the judge jumps in and becomes the second prosecutor. Go back to your first point on whether Pizarro saw or was ever with people who were part of the conspiracy. Wasn't there a surveillance tape of a meeting of them with your client present at the meeting? He was there very briefly. Okay. So how did that additional testimony add anything to the surveillance tape? Well, there's two issues here. One is the appearance of bias that affects the entire way the judge views jury reviews. Yes, and that's a good point, but that's not my question. It affects it because those were holes that were filled by the judge. They were not filled by the prosecutor in terms of that connection. What hole that was not filled by the surveillance tape regarding your client was filled by an answer that a witness gave in response to a question from the judge. One, my client's presence in the tapes is very, very minor. This provides a more general connection and makes the conspiracy more connected. The other thing that's very concerning is the notebook, because the notebook that the prosecutor clearly had troubles getting the notebook in, the judge jumps in, goes through, lays the foundation, and not as a clarifier, but like a second prosecutor. There's a whole colloquy on that, which is very troublesome. The other thing that's problematic, the judge offers to open up an evidence bag on behalf of the prosecutor. The judge talks about the intent of the prosecutor, and this is probably one of the most problematic parts of it, and it's very similar to what happened in Rivera Rodriguez, because she says when pictures are being brought in, the government does not have, and she says this to the jury, the government does not have any intent to portraying something that is not. And it is clear that the pictures were taken after the search warrant. Now that is bolstering the government's case. It's not acting balanced and fair. It's not clarifying for both sides. I think Judge Kenyatta has a question. Was there an objection? On that particular one, my notes don't indicate that there was. But I was just going to say, but I don't think we need to come back here on ineffective assistance. I think this is something that we should look at now, and I think that Rodriguez-Rivera gives us the ability, or Rivera Rodriguez gives us that ability, and there are many other examples which I can continue with in my rebuttal. You have five minutes. Okay, thank you. Thank you. Good morning, Ms. Rivas-Arriba. May I please the court? I am Counselor for Luis Nieves Canales. I would like to start with my first issue. The first issue that I raised was whether as to count one there was evidence to convict Nieves Canales. In this case, judges, the government had eyes and ears in those drug points for about five or six years. They had people there who worked for them, told them what was going on, videotaped, bought drugs, and mingled with the drug points people. Those two informants testified at trial. They never mentioned Luis Nieves Canales. They never saw him. They never met him. They never saw him with guns. And most of all, none of them bought or saw that there was a drug point for marijuana of $12. Perdomo, in fact, said that there were three drug points, five, six, and nine dollars, not a $12 drug point. Now, why do I now say this? Because those two informants were the ones who really gave a thorough view of what these drug points were. They were there. They were seeing on a day-to-day basis what was going on. They were the ones who were able to say who sold, what was sold, what was bought. Isn't there direct evidence involving your client? None. None of these are. Let me see now. Okay. We have Pizarro. Several witnesses identified Nieves as the owner of the marijuana bags. So let's say yes. Pizarro was one of them. Now, Pizarro, George. I'm not finished. I'm sorry, George. I'm very sorry. No. Martinez testified that in 2004, Nieves would bring the drugs he was to sell on his shift. He had two men that would tally the sales together with him. Okay. Let me talk about those two. One of them, Pizarro, stated that he lived there and he worked there for many years. However, this man had never mentioned Nieves, Canales, until trial. He had met with the agents. He had seen videos, photos. He has seen photos of my client. You're attacking his credibility. I'm sorry? You're attacking his credibility. No. What I am saying, George, is that what he said was so scant, general, that it can't be. Because if he lived there, as well as the other two who were the agents' eyes and ears, he should have seen the same things. And he never spoke in details about Nieves, Canales. Pizarro said that he saw him with weapons because he was an armed guard. He never placed Nieves at the drug point with guns. And he said that at some point, Nieves gave him drugs to take to the drug point. He never sold for him. He never worked for him at all. However, he did work for his brother, Nieves' brother, Quintana, one of the big ones there. Not even then did he say that my client had anything to do with his brother and the drug points that were there. Diaz, Martinez, George, was someone who stated that he came from somewhere else. He was there for a few months, about five or six months, and he said that he sold for my client, Nieves. However, Diaz never saw my client at the drug point with guns. He said he saw him with guns where he lived, at his house. And that he had seen him dress when he went to work. Diaz says that he sold $12 baggies. He doesn't know who else sold that drug there, George. That is something that is so scant, superficial, because sellers, George, we know, that take shifts, and they give from one to the others, and they know who the others are. Pizarro didn't know who they were. Diaz didn't know who they were. What they stated at trial, George, was very scant, general, nothing that was really strong as to Nieves Canales. So let me make sure I'm understanding the argument. Your client was convicted on, I think, five counts. That is correct. And those included aiding and abetting and cocaine-based, cocaine, conspiracy-possessed firearms. What you're challenging is the conspiracy to possess with intent to distribute, count one. That is correct, George. And so do I understand your theory is that although the jury could have found that your guy had guns and was selling drugs on his own, they couldn't have found that he was part of the conspiracy? That's correct, George. The widespread conspiracy that was so big. And the difficulty with that is that so much of the, didn't a lot of the evidence establish that this was kind of a tyranny, conspiracy in this place? There was no one else who was going to be selling drugs in there without Alfalfa's permission as part of the whole deal. How do you address that? Well, what was said was that, let me see if I can be clear on this. Pizarro said, George, that many other drug points were opened. Okay. And I also, I also, I also believe he said that, that they met, he said that they had met to see who could sell. My client was never mentioned in those that met with Alfalfa to see who could sell. He might have had a small drug point on his own. It could have been because Nieves was never placed in any, in anywhere, meeting with leaders or the big drug point owners. There is another witness, Serrano Ayuso. Serrano spoke about meetings and leaders. My client was never there. So maybe he could have sold on his own, but there was never any $12 baggies bought by anyone or even seen by anyone, George. Counsel, am I correct that the factual narrative in the indictment states that your client ran a cocaine drug point? That is what was stated in the indictment, George. And do you know how defense counsel at trial exploited the difference between that assertion and the evidence, which was more about marijuana except for, I guess, the one time? No, Judge. No, I don't. All right. I don't know. Yeah, it's kind of a record reader. Thank you. Good morning. Excuse me. My name is Olga Castellon. Oh, yes. All right. I have a list of people here, and you're at the end. Thank you. I'm an AUSA in charge of the prosecution in this case. I am going to address Mrs. Liz Arriba's argument from the start. In terms of her client and as to his participation in the conspiracy, the United States understands that the evidence was overwhelming as to the participation of Mr. Nieves Canales and his knowledge in the operation of the drug point that was operated in this housing project. This drug conspiracy had four different locations that actually were covered by the same group of individuals. And during the time frame of the conspiracy and the onset, which was in the year 2000 up until the year 2007, Al Falfa led this group of individuals to the distribution of narcotics and to control the way his business was going to be operated. The witnesses identified Nieves Canales as being one of those persons that, from the beginning, started in the operation and running of this drug point. And the witnesses, not only Wilberto Pizarro, but also Diaz-Martinez and Serrano identified this person. Serrano identified him as not knowing the person but seeing him in the other location, which was El Prado, engaging in conversations with other drug point owners. But Wilberto Pizarro received drugs from Nieves Canales and so did Diaz-Martinez, who were identified during the trial as being sellers for the drug trafficking organization. They worked for him. They knew details about him. Then when they were testifying, they were shown pictures of these locations and they identified where, within the housing project, which is a large housing project, Nieves Canales lived. So they have actual knowledge of who was this person. They even knew that he was a bus driver, that before he went to work in his work as a bus driver, he would give out the drugs that were going to be sold at the drug point. And these witnesses, and we have to differ from Mrs. Lizarrior's interpretation, when they sold at the drug point, by the authorization of Alfalfa, they had knowledge not only of what they were selling and who were the owners of the drugs they were selling. They were separated by brands, by prices, and they would know not only the ones who sold the marijuana for the $12, but they also knew about the owners of the other marijuana that was sold. And I don't want to explain the difference between the factual narrative in the indictment, which says that Nieves ran a cocaine drug point, and the evidence that came in at trial. The indictment charges that he ran a different brand, just a specific brand of cocaine, but the actual conspiracy, the way it was explained, and that he was participating in the conspiracy, he was in charge of all drugs that were sold. And the evidence proved that the marijuana and the cocaine that were sold in the housing project, specifically in CES, were sold in the same location. So, I mean, I can understand how a grand jury may have received evidence about a cocaine drug point. It ends up in the indictment, and then as the case goes to trial, it's not there for one reason or another. But that's actually what I'm asking. How do you explain why there's no testimony about him running a cocaine drug point? And let me tell you why I'm asking the question. It has to do not so much with the variance argument that counsel makes, but with Elaine in place now, and where drug quantity and specific types of drugs and quantities are thought to be elements, it's going to get very confusing sorting out the Elaine issues in this case. So I was just wondering if there's an explanation for the difference in the indictment and the evidence that came in. But it is our understanding that Nieves-Canales was also found guilty in the substantive counts, and when the judge in the verdict form... In the indictment with respect to cocaine, but the only evidence that I saw of that was that one incident where somebody who was in a car with him had a vial of cocaine. That seems to me somewhat different than running a cocaine drug point. And the only explanation would be that the fact that the drug point where he's marijuana was sold was also, the cocaine was also being sold in that same location. So not only the evidence that he was running the drug point, but also the fact that he was arrested in a far location, which is in the Aybonito housing projects, in possession of an illegal firearm, also goes into the defendant's knowledge and active participation within the conspiracy as his role, as a person that not only would trade in the drug business, but also that he would carry firearms in furtherance of the drug trafficking organization. So as to the evidence that amounts for Nieves-Canales and the verdict that was issued against the defendant because he was found guilty, the evidence was overwhelming as to his particular participation. Now I'm going into the argument presented by counselor for Galán Olavarria and the search warrant that was executed. This was a matter that was not only presented and there was a hearing that was held before a magistrate judge in which the judge had the opportunity not only to listen to the testimony of the affiant and look into those falsities that were claimed by the defendant, but also additional evidence photographed and the testimony presented. The magistrate judge determined that there was not a falseness into the agent's observations of the several distant and different criminal activities that were actually Galán Olavarria being seen at the housing project. And one of the findings was that the agent who was making the observation had an obstructed view for the point where he was located during the surveillance and where the apartment for Galán was located. And this apartment was located, it's a housing project, it's a building that consists of six different units and they have a stairwell. And what its claim or what was always the claim for Galán that the agent could have not seen, it was a reasonable inference for the agent who is doing this physical surveillance in the area who has an obstructed view that if two apartments are in front of him and there's a door that could be easily seen because it has nothing that impedes the disability and there's a right location and the only place that he could go is either going up or going to the left and he did not go either of those directions, then he made the inference that he was going to the apartment at the right side of that building. There was a suggestion this morning that there might have been a back door. Well, the, I don't know if it's in the record, but I understand that he was, the agent was asked and when agent Galán testified during trial as to the execution of the search warrant, there was nothing on the record that suggests that there might be a back door that leads to nowhere because that's a second apartment of a building that actually is a multi-complex building. So the, not only the magistrate judge made that finding that there was not falseness in the affiance statements that led to the issuance of the search warrant, but also the jury had the opportunity to also make that determination because the evidence was presented as to the observations and the execution of the search warrant and the way that agent Galán described how he got access into the apartment, that it was the second apartment to the right and there were several pieces of evidence that depicted how this apartment was located within that building that amounts to the credibility of the agent in terms of what was the statement that led to the issuance of the search warrant. And later on as to the evidence that was seized from that apartment that proved that the defendant's participation in the charged conspiracy and the evidence that was later on corroborated by the several witnesses that identified Galán as one of the leaders who went into the higher up ranks of the drug trafficking organization, that he had control of the operations themselves, also at the El Prado housing project which was the other housing project that was controlled by the DTO or the drug trafficking organization, and also the possession of the weapons for he was charged and he was found guilty. The jury made the determination because it was posed the question to them that the defendant not only was guilty for being a prohibited person in possession of a firearm but also that the firearm that he had in his possession when the search warrant was executed was a long rifle, an AK-47 that was also identified by his employee who testified in trial and he even explained to the members of the jury that he knew where exactly within that apartment that particular weapon was being stored. The evidence also showed that Galán Molavarria had possession of brands and they had stickers and stickers are used to identify drug points and in the other locations which were Arribonito also these brands were also and stickers were seized from different interventions that actually came out throughout the trial. I have one more question about Galán. The verdict form, the not guilty, guilty, beyond a reasonable doubt, this case was tried before our Rodriguez decision. Do you know whether those verdict forms have been changed? Your Honor, I think actually it's this verdict form, I think it's spontaneous with the one that was used in Rodriguez. It certainly is not used anymore. The court has issued this ruling in terms of a similar situation. We understand it's here present. The defendant has failed to show that the outcome of the case would have changed in terms of that particular verdict form and moreover since the judge instructed specifically throughout the jury instructions in this case as to reasonable doubt and she was very cautious as to instructing the jury that the standard for making the determination was the reasonable doubt and in this particular case the jury, as this court knows and the record reflects, made the determination as to the defendants being guilty of some substantive counts and actually acquitting them of some others. So the jury had a base on their determinations. We can make the inference that they used the instructions that were given to them and they applied them to their cases. Do you know whether this same verdict form was used with respect to the other two defendants? Yes, it was the same for the defendants and for all the counts as I understand. As to the issue of bias and what has been presented to the court of the actions that the court took that had not been presented aside from presenting different and isolated events in which the court had to take measures and to control not only the presentation of the evidence but also as to control the objections or continuous objections of certain attorneys, the record does not reflect a judicial bias that could be similarly to the one that it was in the recent decision of Rivera-Rodriguez. In this case the judge did not take any particular active role and we have to defer from counsel in terms that she acted as a second prosecutor. Let me ask you to make sure I'm understanding the facts correctly. Based on the collective briefs that have been filed, I counted 14 instances where the judge started questioning the witness. In every one of those instances that are cited in the brief, the thrust of the judge's testimony was to clarify or get to or get around an objection all towards the benefit of the prosecution in all 14 instances. Were there any instances? Let me ask you two questions about that. Am I misreading any of those instances that are in the brief, those 14 instances? And secondly, were there any occasions where the judge intervened to clarify the making of a point that the defendant was ever trying to make, any defendant was trying to make? Yes, she did. This is an 18-day trial which multiple pieces of evidence were presented where multiple questions were posed by over 15 witnesses that testified throughout the trial. And sometimes the point when it was not clear, and I cannot pinpoint to any specific situation, but it was also into the presentation of the evidence and to move along into the presentation of the evidence or the continuous objections being presented by the defendants that could not get the point across and the judge made the clarification. But most of the times when questions were not proper and were objected, the record reflects that the judge simply denied, I'm sorry, granted their objections and a different question was posed and without the judge doing the intervention. Right now what we've got is we've got the briefs and we've got 18 pages, 18 days worth of trial testimony. And in the briefs you don't cite, if I read your brief correctly, to a single instance where the judge helped clarify a defense point or helped the defense get over. It seemed to me whenever the prosecution objected, the judge would, if the objection was correct, simply sustain where we're pointing to instances where when the defendants objected, she then jumped in and asked questions that obviated the objection. If you're telling us that there are instances where she did that for the defense, it would be very helpful to know where, when that happened. Well, I understand your question and at this time I cannot go in specifically because these are 18 days of trial, but I also understand that every time the objection was posed, most of the times these objections, and I say objections were posed by the defense counsels, these objections were discussed at sidebar. And most of the time the judge would also instruct not only the prosecution to either refrain from a line of questioning or simply just grant the defendant's objection. So as to the point of judicial bias and that the court's action in some way might have been interpreted that she was in favor of the prosecution's case or taking side with the prosecution, I think that the record throughout the trial does not, aside from these isolated events that probably the defense could mark without having the entirety of the testimony and what was transpiring during trial, that these situations were also addressed by the court when the court instructed the jury if any prejudice that has not been shown here, because we are here making this allegation without having preserved any claim before the district court in terms of the participation or the questions that were posed by the court, aside from the only instance in which Ms. Parson cites from Mr. DeLee's statement, the court instructed the jury that any comment or any question that the court may have done so during the trial could not be taken into consideration by the jury when they were evaluating the evidence and trying the case just only by the facts. And the court has no tendency to go towards one party or the other. So I think that the judge also cautiously instructed the jury not to take sides and not to make any inference if the court made any questions, because as she explained, she explained that that was the role of a judge in terms of controlling and managing the trial in this case. What's your theory then as to why, based on the record as I understand it now, she intervened 14 times to help the prosecution and zero times to help the defendant? How do you explain that? Well, I would not say that she did to help the prosecution. I think that the court, if she intervened at these 18 instances, that probably it could be distinguishable from the ones in the case in Rivera-Rodriguez, because this one was not either assisting the witness or making an inference or making a statement that might lead the jury to believe that she was, in fact, helping the prosecution, but to clarify the presentation of the evidence. Anything further? Well, there are several errors that have been addressed by certain defendants, specifically Calanga-Lavarria, that he is trying to adopt some of the errors that were claimed by defendant Ramon Lanza, when Ramon Lanza was addressing and making his briefing to the court, and the United States objected to these adopting by reference and the allegations and the arguments presented to this court by Ramon Lanza, as defendants. Once they were not objected, and most of them were not preserved claims in the district court, most of them are evidentiary rulings, and in that particular allegation, by adopting these arguments, none of them, Calanga-Lavarria states how he has been prejudiced by the evidence that was, or the errors that were asserted by Ramon Lanza. So for that particular argument, the United States understands that these belated arguments should not be considered by this court in terms of Calanga-Lavarria. Basically, the rest of the arguments of the government are submitted in the brief, and if this court has any other questions for this prosecutor? Thank you. Thank you again. I just wanted to let the court know that in volume five at page 57 is where Mr. Delis speaks about the concern about the judge having to go back in and do this, and it may not be as artful or as specific, but it certainly is a concern. It conveys the impression, and in the context of that, how frustrating it was to have the judge having to do that all of the time. With respect to the notebook, there were objections throughout 100 to 102 in volume three as well, where there were these objections and there were these sidebars. And the sidebars, I want to just clarify something. I think there's two issues on the bias. One is the appearance of the bias that was made clear to the jury, but there were also the statements and actions of the judge that showed that she was in fact biased and that she had a stake in the outcome. It wasn't a financial stake, like in Ohio, to me, but it was a stake in terms of wanting a conviction and wanting the prosecution to prevail. And I think the most evident aspect of that was when the judge said, and this was on volume eight, once again, that she had a stake in the outcome. And then in volume 17 to 18, when they were at a sidebar and the government was trying to get in certain hearsay testimony, which the court probably is aware became a very big issue throughout as one of our other points, which I won't have time to go into. But the point is that when they get to the sidebar, the judge says and tells the prosecutor what to do as a prosecutor, as if she's, again, the second prosecutor or the supervising prosecutor. Get the name in, just to avoid the hearsay that you got. Okay, so she's acknowledging that there's a hearsay problem, because then the jury is able to compare, corroborate, or discredit whatever the informant said. And here's the critical sentence, we need that in. And that's one of the issues I have with the judge in this case, is that when she takes on not a clarifying role, but actually a very, what in the words of my colleague, Daniel Rivera, which is a visibly and forcibly assuming the role of the prosecutor, she does it not only as giving the appearance to the jury, which then the issues that she's dealing with and a lot of what she focuses on. That conversation was at the sidebar. That was at the sidebar, right. But I do think there is a basis for an actual prejudice claim, and then we fall into the structural error issues. And I think she's, you know, obviously quite frustrated that this prosecutor isn't doing what she needs to be doing, and instead of even handedly letting the prosecutor do what needs to be done and let the chips fall where they may, she takes on that role, and that's a very great concern. But when we see her identifying herself as the prosecution, that we need that in, is particularly troublesome. And it gets back to this notion of the stake in the outcome. With respect to the notion of how this conspiracy and the various issues that were here, my client was acquitted of four of the six counts, and the two that he was convicted of were the crack and the conspiracy itself. So the issues regarding getting around hearsay objections, getting around making points to connect, that's a big issue. To connect the participants to the conspiracy, provide an additional layer of that that is prejudicial, extremely prejudicial to my client in a case that was far from overwhelming. The fact that the jury was able to distinguish between some counts and others and find your client not guilty seems to go against the issue of bias. That's an excellent one, Your Honor, and here's the issue, is that the issues that she dealt with were not the issues that my client was acquitted of. She was, he was convicted on the issues that involved the crack and the conspiracy itself, which was the notebook, and the issues of the conspiracy and the hearsay testimony that were part of that. So I think in some ways that proves the case. You have a judge who's actually offering to open physical evidence on the prosecution's case. The visual impact of that, not to mention, you know, taking off the black robe, is astounding. And it's one of those things where I really see this as actual bias, and it's the kind of thing that you can't really weigh and say, what does the jury think? And we can see that because the issues that were, she was most concerned with the judge, which was getting these connections in the conspiracy and the notebook were essential. I want to add, I just have a few seconds, I wanted to add something on the conspiracy itself. Because there was a discussion about how the instruction on that conspiracy. I want to note that as it set out in our brief, in fact, the judge did not properly instruct them on conspiracy when she, when the jury was confused, gave a note. She actually left out a very important aspect of that, and that's the charge my client was convicted on. Thank you.